# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

TIMOTHY L. PINGLE,          )      CASE NO. 1:12-cv-2892
                                    )
            PLAINTIFF,     )      JUDGE SARA LIOI
                                    )
                                    )
vs.                         )
                                    )      **MEMORANDUM OPINION AND**
                                    )      **ORDER**
                                    )
RICHMOND HEIGHTS LOCAL     )
SCHOOL DISTRICT BOARD OF     )
EDUCATION, et al.,             )
                                    )
          DEFENDANTS.   )

This matter is before the Court on two motions for summary judgment on plaintiff's amended complaint. The first is the motion of defendant Robert J. Moore ("Moore") (Doc. No. 91), accompanied by a brief in support (Doc. No. 91-1 ["Moore Mot."]). Plaintiff has opposed Moore's motion (Doc. No. 100 ["Opp'n Moore"]), and Moore has replied (Doc. No. 104 ["Moore Reply"]).

The second is the motion of defendant Richmond Heights Local School District Board of Education ("Board"). (Doc. No. 92 ["Board Mot."].) Plaintiff has opposed the Board's motion (Doc. No. 99 ["Opp'n Board"]), and the Board has replied (Doc. No. 103 ["Board Reply"].) Defendants' motions are ripe for decision and, for the reasons that follow, the motions are granted in part and denied in part.

# I. BACKGROUND

This case has an extensive factual and procedural history, as reflected in earlier opinions by this Court. Certain specific facts will be presented in greater detail later in this opinion as necessary for the Court's summary judgment analysis. Briefly, plaintiff Timothy Pingle ("plaintiff" or "Pingle") was employed by the Board as its secondary school principal beginning in August 2011 under a two-year administrator contract. In November 2011, the superintendent of the school district—Linda Hardwick ("Hardwick"), an African American female—was suspended by the Board.

The Board was required to appoint an interim superintendent, and Pingle, who is Caucasian, believed he was qualified for the job. Prior to the Board's selection of an interim superintendent, Pingle sent two emails to two Board members on November 6 and 7, 2011, related to the suspended superintendent and the Board's imminent selection of an interim superintendent. The Board selected defendant Moore to be the interim superintendent. Moore is African American, and was the elementary school principal at the time.

Upon the recommendation of Moore, the Board suspended plaintiff in December 2011 with pay for the stated reason that Pingle's November 6 and 7 emails were racist and violated Board policy. On the morning of his suspension, plaintiff sent all the Board members another email entitled "My Side of the Story" which purportedly explains the context of his emails of November 6 and 7. In February 2012, the Board suspended Pingle without pay, and initiated termination proceedings for five (5) reasons, two (2) of which were the November 6 and 7 emails.

Ohio Rev. Code § 3319.16 contains detailed procedures for terminating teacher contracts, which were followed by the Board. The statute provides for four levels of review, the first being a hearing conducted by a neutral referee. (*See* Doc. No. 46 (Opinion and Order ["OO"]) at 1578.[1]).

The hearing was conducted over five (5) days, during which both sides offered testimony and exhibits, and the referee thereafter issued a report. (Doc. No. 91-2 (Report, Findings of Fact and Recommendation of Referee Joel R. Hlavaty ["Ref. Rpt."]) at 3340.) In his report, the referee found that there was good cause to terminate Pingle based on the emails of November 6 and 7, 2011:

> I find that the racial comments made by Dr. Pingle in the two emails are sufficient to give the Board good and just cause to terminate his contract. In so finding, I note that as an administrator and secondary school principal, Dr. Pingle, in addition to his various duties and responsibilities, was or should have been a role model to others in the District, particularly teachers and students. Regardless of whether anyone outside of the Board knew of his emails, his action in sending them demonstrated conduct that was unacceptable and which the Board could not risk him repeating.

(Ref. Rpt. at 3355.).

The next step in the statutory process is review of the referee's report and recommendation by the school board. By resolution dated September 10, 2012, the Board accepted the referee's report and recommendation and voted unanimously to terminate plaintiff's contract "on the grounds of good and just cause." (Doc. No. 92-1 at 3617-19 (["9/10/12 Resol."]) at 3617-19.)

The next available review is an appeal to the court of common pleas in the county in which the school is located. Plaintiff filed that appeal in the Cuyahoga County Court of Common Pleas, along with claims of discrimination and retaliation under federal and state law.

---

[1] All references to page numbers are to the page identification numbers generated by the Court's electronic docket system.

Defendants removed the case to this Court pursuant to 28 U.S.C. § 1331 based upon plaintiff's federal claims. (Doc. No. 1 (Notice of Removal) at 2.).

After various motions and rulings by this Court regarding the removed complaint, plaintiff sought leave to dismiss with prejudice his state court appeal pursuant to § 3319.16—count 1. (Doc. No. 47.) The Court granted plaintiff's motion (Doc. No. 50), and thereafter, plaintiff filed an amended complaint with leave of Court. (Doc. No. 54 (First Amended Complaint ["Am. Compl."]).).

The amended complaint asserts five counts: Count 1 (against the Board)—race and color discrimination in violation of Title VII of the Civil Rights act of 1964, because plaintiff was not considered for selection as interim superintendent based on his race—Caucasian, and because plaintiff was paid less than the African American elementary school principal (Am. Compl. ¶¶ 51-58); Count 2 (against the Board and Moore)—race and color discrimination in violation of Ohio Rev. Code §§ 4112.02(A) and 4112.99, because Pingle was not considered for selection as interim superintendent based on his race—Caucasian, and because plaintiff was paid less than the African American elementary school principal (Am. Compl. ¶¶ 59-65); Count 3 (against the Board)—retaliation in violation of Title VII for terminating plaintiff as secondary school principal, for engaging in the protected activity of: (a) complaining both orally and in e-mails on or about November 7, 2011, that he was not being considered for interim superintendent because he is Caucasian, and that he was paid less than the African-American elementary school principal, and (b) filing an EEOC charge on March 9, 2012 (Am. Compl. ¶¶ 66-72); Count 4 (against the Board and Moore)—retaliation in violation of Ohio Rev. Code §§ 4112.02(I) and 4112.99 "for opposing unlawful discrimination and/or participating in proceedings related to complaints of unlawful discrimination" (Am. Compl. ¶¶ 73-75); and

4

Count 5 (against Moore)—aiding and abetting discrimination in violation of Ohio Rev. Code §§ 4112.02(J) and 4112.99 by "[beginning] a campaign meant to harm Pingle and [putting] in motion the events to incite, compel and coerce the Board into starting the process that resulted in Pingle's suspension with pay on December 12, 2011, converting Pingle's suspension to without pay on February 28, 2012 and ultimately terminating Pingle effective Septermber 20, 2012. These actions included Moore placing a hold on Pingle license status on or about January 26, 2012 by filing a complaint with the [Ohio Department of Education] challenging Pingle's academic licensure." (Am. Compl. ¶¶ 76-79.).

Moore moves for summary judgment on Counts 2, 4 and 5 of the amended complaint. The Board moves for summary judgment on counts 1, 2, 3 and 4.

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if its resolution affects the outcome of the lawsuit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If a reasonable jury could return a verdict for the nonmoving party, then summary judgment is not appropriate. *Id.*

The moving party must provide evidence to the court which demonstrates the absence of a genuine dispute as to any material fact. Once the moving party meets this initial burden, the opposing party must come forward with specific evidence showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d

265 (1986); *Anderson*, 477 U.S. at 250. The nonmoving party may oppose a summary judgment motion "by any of the kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves[.]" *Celotex*, 477 U.S. at 324. The Court must view all facts and evidence, and inferences that may be reasonably drawn therefrom, in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962).

General averments or conclusory allegations of an affidavit do not create specific fact disputes for summary judgment purposes. *See Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 888-89, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). "Summary judgment requires that a plaintiff present more than a scintilla of evidence to demonstrate each element of a prima facie case." *Garza v. Norfolk S. Ry. Co.* 536 F. App'x 517, 519 (6th Cir. 2013) (citing *Van Gorder v. Grand Trunk W. R.R.*, 509 F.3d 265, 268 (6th Cir. 2007)). "'The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party].'" *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989) (*quoting Anderson*, 477 U.S. at 252).

In summary, the district court's review on summary judgment is a threshold inquiry of determining whether there is the need for a trial due to genuine factual issues that must be resolved by a finder of fact because those issues may reasonably be resolved in favor of either party. *Anderson*, 477 U.S. at 250. Put another way, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *see also Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 578 (6th Cir. 2003).

**B. The Preclusive and/or Res judicata Effect of Prior Proceedings**

**1. Preclusive effect of the § 3319.16 proceedings**

Moore argues on summary judgment that the § 3319.16 statutory hearing, referee's findings and recommendation, and Board resolution accepting that recommendation, preclude plaintiff's state[2] discrimination, retaliation, and aiding and abetting claims through collateral estoppel because the administrative proceedings afforded the parties ample opportunity to litigate the issues in this case and those issues have been decided.[3] (Moore Mot. at 3322-26.).

In *University of Tennessee v. Elliott,* 478 U.S. 788, 106 S. Ct. 3220, 92 L. Ed. 2d 635 (1986), the Supreme Court considered whether factual determinations of state administrative agencies are entitled to preclusive effect in federal court. In *Elliott,* the respondent requested an administrative hearing after being informed that he would be discharged for inadequate work performance and misconduct on the job. The respondent in *Elliott* also filed suit in federal district court, alleging that his proposed discharge was racially motivated. The administrative hearing proceeded, and after the presentation of extensive evidence, the ALJ concluded that the University's actions were not racially motivated. The respondent did not seek review of the administrative proceedings in state court; instead, he pursued civil rights claims in federal court. The district court held that the administrative ruling was entitled to preclusive effect. Respondent appealed to the Court of Appeals for the Sixth Circuit, which reversed, holding that federal courts are not bound by the unreviewed findings of state administrative agencies.

The Supreme Court affirmed in part and reversed in part, holding that when an administrative agency is acting in a judicial capacity and resolving disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, federal courts must give the agency's fact-finding the same preclusive effect to which it would be entitled in the state's courts. *Id.* at 799. The

---

[2] Any preclusive effect the § 3319.16 hearing may have with respect to plaintiff's state claims does not apply to plaintiff's Title VII claims. *Smith v. Perkins Bd. of Educ.*, 708 F.3d 821, 827 (6th Cir. 2013).

[3] Earlier in this litigation, the defendants moved for judgment on the pleadings on the grounds that plaintiff's retaliation claim under Ohio Rev. Code § 4112.02(I), and aiding and abetting claim under Ohio Rev. Code § 4112.02(J), was barred by Ohio Rev. Code § 4112.24(C), which forecloses age discrimination claims under Ohio law when an employee has an opportunity to arbitrate the discharge, or the arbitration has found the discharge to be for just case. Finding that Ohio Rev. Code § 4112.24(C) neither applied to nor foreclosed plaintiff's retaliation and aiding and abetting claims, the Court denied defendants' motion for judgment on the pleadings with respect to those two claims. *Pingle v. Richmond Heights Local Sch. Dist. Bd. of Ed*., et al., No. 1:12-cv-02892, 2013 WL 5467189, at *2-4 (N.D. Ohio Sept. 30, 2013).

> Court based its decision on issues of efficiency—avoiding the cost and vexation of repetitive litigation, the public's interest in conserving judicial resources—and issues of federalism, as expressed through the Full Faith and Credit Clause of the Constitution.

*Featherstone v. Columbus Pub. Sch.*, 39 F. Supp. 2d 1020, 1023 (S.D. Ohio 1999) (footnote omitted).[4]

Interpreting the Supreme Court decision in *Elliot*, the Sixth Circuit developed a three-part test for determining whether a state administrative agency's decision is entitle to preclusive effect in a subsequent federal action. *Nelson v. Jefferson County*, 863 F.2d 18 (6th Cir. 1988). Under *Nelson*, the court must first determine whether the agency acted in a judicial capacity, that is, hears evidence, affords the parties an opportunity to brief and argue their version, and provides an opportunity for court review of adverse findings. Second, the Court must determine whether the agency's decision would have preclusive effect under the applicable state law. Finally, the court must decide whether "the federal action seek[s] to litigate issues already determined by the state agency." *Id*. at 19. As to the third prong, "[s]ince *Elliot* dealt with issue preclusion, any issues not necessarily involved in and determined in the [state administrative] hearing, will not be precluded in federal court." *Id.* at 19-20.

In Ohio,

> The doctrine of issue preclusion, also known as collateral estoppel, holds that a fact or a point that was actually and directly at issue in a previous action, and was passed upon and determined by a court of competent jurisdiction, may not be drawn into question in a subsequent action between the same parties or their privies, whether the cause of action in the two actions be identical or different. *Norwood v. McDonald* (1943), 142 Ohio St. 299, 27 O.O. 240, 52 N.E.2d 67,

---

[4] While not addressed in its motion for summary judgment, the Board moved to cite the additional authority of *Featherstone v. Columbus Public Schools*, 39 F. Supp. 2d 1020 (S.D. Ohio 1999). (Doc. No. 110.) It is not clear whether plaintiff's response opposes the Board's motion, or simply rebuts the legal proposition for which the Board seeks to advance the additional authority. (Doc. No. 111.) Either way, the Board's motion is moot as the Court's consideration of *Featherstone* in this analysis was not prompted by the Board's motion. Accordingly, the motion is denied as moot.

paragraph three of the syllabus; *Trautwein v. Sorgenfrei* (1979), 58 Ohio St.2d 493, 12 O.O.3d 403, 391 N.E.2d 326, syllabus; *Goodson v. McDonough Power Equip., Inc.* (1983), 2 Ohio St.3d 193, 2 OBR 732, 443 N.E.2d 978, paragraph one of the syllabus. While the merger and bar aspects of *res judicata* have the effect of precluding the relitigation of the same cause of action, the collateral estoppel aspect precludes the relitigation, in a second action, of an issue that has been actually and necessarily litigated and determined in a prior action that was based on a different cause of action. *Whitehead v. Gen. Tel. Co.* (1969), 20 Ohio St.2d 108, 112, 49 O.O.2d 435, 437-438, 254 N.E.2d 10, 13. "In short, under the rule of collateral estoppel, even where the cause of action is different in a subsequent suit, a judgment in a prior suit may nevertheless affect the outcome of the second suit." *Id.* at 112, 49 O.O.2d at 438, 254 N.E.2d at 13.

*Fort Frye Teachers Ass'n, OEA/NEA v. State Emp't Relations Bd.*, 692 N.E.2d 140, 144 (Ohio 1998).

With respect to the *Nelson* analysis, plaintiff appears to concede that the § 3319.16 proceedings satisfy the first prong of *Nelson*. (Opp'n. Moore at 3709.) The Court agrees that, pursuant to *Featherstone*, a § 3319.16 state administrative hearing satisfies the first prong of the *Nelson* test. *Featherstone*, 39 F. Supp. 2d at 1023 ("[A] hearing conducted pursuant to § 3319.16 is judicial in nature[.]").

Moore argues that the second and third prongs of *Nelson* are also satisfied, and that plaintiff is attempting to re-litigate issues that were presented and decided at the statutory hearing, including facts relating to the grounds for plaintiff's suspension and termination, Moore's decision to report the November 6 and 7 emails to the Ohio Department of Education ("ODE"), racial issues swirling around two other school district employees—Hardwick and Jason Popp ("Popp"), and alleged harassment by Board members Joshua Kaye ("Kaye") and Bob Fox ("Fox"). (Moore Mot. at 3324-25.) Because plaintiff presented voluminous evidence at the § 3319.16 hearing in an effort to establish that he was improperly suspended and terminated due to racial bias and retaliation, Moore contends that plaintiff should be precluded from re-litigating those issues in the instant action. (*Id*. at 3325.).

9

The Court is not persuaded that the § 3319.16 proceedings preclude plaintiff's state law claims. While plaintiff may have presented evidence at the § 3319.16 hearing regarding his allegations that he was the subject of reverse race discrimination and retaliation, those issues were not "actually and directly at issue" during the statutory hearing, nor were they "passed upon and determined" by the referee. *Fort Frye Teachers Ass'n,* 692 N.E.2d at 144.

The only specific issue before the referee was "whether the evidence presented supports the [five (5)] grounds specified by the Board for the termination of Dr. Pingle's contract, and whether the grounds constitute good and just cause for the termination of his contract such that his termination should be recommended to the Board." (Ref. Rpt. at 3341.) The five (5) grounds for termination under consideration by the Board for terminating Pingle, and before the referee, were:

> 1. Dr. Pingle's statement to the Board President by email dated November 7, 2011, advocating that the Board violate Board Policy 2260B, and State and federal law, and disqualify a candidate for Interim Superintendent based on the candidate's race;
>
> 2. Dr. Pingle's repeated racially insensitive comments made during student assemblies at the beginning of the school year;
>
> 3. Dr. Pingle's racially derogatory statements and stereotypes as set forth in a November 6, 2011 email to the Board President;
>
> 4. Dr. Pingle's insubordination in directing the Secondary School Assistant Principal not to attend a "cabinet" meeting of administrators called by the Interim Superintendent on November 8, 2011, after the Interim Superintendent's office had directed the Assistant Principal to attend that meeting; and
>
> 5. Dr. Pingle's failure to properly and efficiently process student discipline referrals from November through his relief from duties in December, 2011, resulting in a backlog of almost a month in processing such referrals.

(Ref. Rpt. at 3341 (citation to Board resolution omitted).).

What was not before the referee, and not decided by him, was whether Pingle was subject to reverse discrimination with respect to the selection of the interim superintendent by the Board and with respect to his pay relative to the elementary school principal, or whether he was terminated in retaliation for complaining about both those issues, as plaintiff alleges herein. While the referee concluded that the Board had good cause to terminate plaintiff, he made no fact findings and arrived at no conclusions regarding pretext or other elements of plaintiff's state law claims because those issues were not directly before him. In order for the § 3319.16 hearing to preclude plaintiff's discrimination and retaliation claims under Ohio law and *Nelson,* the issues of whether Pingle was subject to reverse discrimination and/or retaliation would have had to been determined by the referee.  *Nelson*, 863 F.2d at 19-20.

It is true that a § 3319.16 hearing may preclude subsequent actions in federal court. *Featherstone*, 39 F. Supp. 2d at 1023-25. But that preclusive effect is not automatic and is subject to the *Nelson* analysis. The Sixth Circuit has declined to "apply administrative preclusion when the agency proceedings served a more limited purpose than the subsequent lawsuit." *Herrera v. Churchill McGee, LLC*, 680 F.3d 539, 549-50 (6th Cir. 2012) (citing *Hicks v. Floyd Cnty. Bd. of Ed.*, 99 Fed. App'x 603, 604-05 (6th Cir. 2004)). In *Herrera*, plaintiff, who is Cuban and of African ancestry, complained that his wages were improperly garnished and he was terminated, and that non-Cuban employees received more favorable treatment. After his termination, plaintiff filed a complaint with the Fayette County Human Rights Commission ("HRC"). *Id*. at 542. The HRC found insufficient evidence to support Herrera's allegations of disparate treatment. *Id*. Thereafter, plaintiff filed a federal civil rights action alleging race discrimination and retaliation, but the district court granted summary judgment to defendant on

the grounds that plaintiff's present claims were essentially the same claims that the HRC had already considered and rejected plaintiff's in administrative complaint. *Id*. at 544.

On appeal, the Sixth Circuit affirmed dismissal of plaintiffs discrimination claim, finding that the issue of disparate treatment had been considered and decided by the HRC. *Id*. at 550. But the Sixth Circuit reversed the district court's decision that plaintiff's retaliation claim was precluded by the HRC proceedings. The Sixth Circuit reasoned that even if plaintiff's excessive absences were sufficient to support his termination and defendant did not treat non-Cubans differently than Herrera, the HRC had not decided any issues regarding retaliation. Therefore, under Kentucky law and *Elliot*, the Sixth Circuit concluded that the HRC proceedings did not preclude plaintiff's retaliation claim. *Id*. at 551-52 (citing *Holliman v. Shelby Cnty. Gov't*, 325 F. App'x, 406, 409-10 (6th Cir. 2009) (even though the board concluded that plaintiff had "violated the policies and procedures of the Shelby County Government, . . . [it] did not decide whether those stated justifications were the *real* reason behind Holliman's firing or just a façade." (emphasis in original)).

In this case, the § 3319.16 proceedings did not decide whether plaintiff was the subject of reverse discrimination or retaliation. With respect to Pingle's retaliation claim, while the referee and Board concluded that Pingle's November 6 and 7, 2011 emails were adequate to support termination, the issue of whether the emails were the true motivation—or a pretext—for his dismissal was not determined. As a consequence, the § 3319.16 proceeding does not collaterally estop plaintiff from bringing his state and federal claims of discrimination, retaliation, and aiding and abetting. *See id*. (citing *Holliman*, 325 F. App'x at 410 and *Cockrel v. Shelby Cnty. School Dist*., 270 F.3d 1038, 1046-57 (6th Cir. 2001)).

This conclusion, however, does not mean that specific fact findings made by the

referee in the § 3319.16 hearing may be disputed or re-litigated by the parties in this action. *See Elliot*, 478 U.S at 799; *Fort Frye Teachers Ass'n*, 692 N.E.2d at 144 ("[A] fact or a point that was actually and directly at issue in a previous action, and was passed upon and determined by a court of competent jurisdiction, may not be drawn into question in a subsequent action between the same parties or their privies, whether the cause of action in the two actions be identical or different."). To the extent that specific facts determined by the referee are relevant to plaintiff's discrimination and retaliation claims, those facts cannot be relitigated by the parties.

### 2. Res judicata effect of dismissal with prejudice of count 1

In its motion for summary judgment, the Board contends that when Pingle dismissed his statutory appeal under § 3319.16 with prejudice, that dismissal resulted in an adjudication on the merits of count 1 and becomes res judicata in this case. (Board Mot. at 3535.) The Board argues that "Pingle is estopped now from arguing that anything else was the cause, or that somehow these emails had a message of non-discrimination that the school board needed to hear." (*Id.*). Plaintiff's opposition is silent with respect to this argument by the Board.

Under *Warfield v. AlliedSignal TBS Holdings, Inc*., 267 F.3d 538 (6th Cir. 2001), "[a] voluntary dismissal with prejudice operates as a final adjudication on the merits and has a res judicata effect." *Id.* at 542 (citing *Harrison v. Edison Bros. Apparel Stores, Inc*., 924 F.2d 530, 534 (4th Cir. 1991) (voluntary dismissal with prejudice "is a complete adjudication on the merits of the dismissed claim")); *see also Mich. Surgery Inv., LLC v Arman*, 627 F.3d 572, 575 (6th Cir. 2010) and *Montgomery v Honda of Am. Mfg*., 47 F. App'x 342, 348 (6th Cir. 2002).

Dismissing count 1 with prejudice operates as a final adjudication on the merits of that count in favor of the defendants. The issue for the Court, then, is what res judicata effect, if

any, this adjudication on the merits of plaintiff's § 3319.16 appeal has on plaintiff's state and federal discrimination and retaliation claims.[5]

> "The rules of res judicata actually comprise two doctrines concerning the preclusive effect of a prior adjudication, claim preclusion and issue preclusion." *J.Z. G. Res., Inc. v. Shelby Ins. Co.,* 84 F.3d 211, 214 (6th Cir.1996). Claim preclusion, or "true res judicata," forecloses litigation of a matter that has never been litigated if a court decides that it should have been advanced in an earlier suit. *See Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 77 n. 1, 104 S. Ct. 892, 79 L. Ed. 2d 56 (1984). Issue preclusion forecloses re-litigation of a matter that actually has been litigated and decided. *Id.*

*American Greetings Corp. v. Cookie Jar Entm't, Inc.*, No. 1:09–cv–1056, 2009 WL 3713686, at *11 (N.D. Ohio Nov. 3, 2009).

The dismissal with prejudice of count 1 does not preclude plaintiff's discrimination and retaliation claims because those claims could not have been asserted in the § 3319.16 hearing, nor, as discussed above, were those issues decided. The purpose of that hearing, and the referee's role, was limited solely to considering whether there was evidence to support one or more of the five (5) grounds for removal advanced by the Board, and if there was such evidence, whether there was good cause for termination. (Ref. Rpt. "Statement of Issue" at 3341.) Indeed, although Pingle argued at the hearing that he was the subject of discrimination and retaliation, the referee specifically noted that his role was not to determine whether Pingle's treatment was unfair. (Ref. Rpt. at 3354 ("While [the Board's treatment of coach Popp and Hardwick] seem inconsistent with the Board's actions with respect to Dr. Pingle, and perhaps unfair in that regard, my duty is to determine whether the Board has demonstrated its stated

---

[5] When a judgment is rendered in state court, "[a] federal court must apply the res judicata doctrine of the state court in which the judgment was entered." *Osborn v. Knights of Columbus*, 41 F. Supp. 2d 830, 832 (N.D. Ohio 2005) (citing 28 U.S.C. § 1738). Because the Rule 41 dismissal and final adjudication on the merits of plaintiff's § 3319.16 appeal took place in federal court the Court need not apply the res judicata doctrine of Ohio. That said, the Ohio res judicata doctrine is substantially similar to the analysis applied herein. *See id*. at 832-33.

grounds for termination of Dr. Pingle's contract and whether those grounds constitute good and just cause.").).

Accordingly, the Court concludes that plaintiff's dismissal of count 1 with prejudice is does not bar plaintiff's federal and state law claims.

## C. Count 1 and 2—Discrimination in Violation of Title VII and Ohio Rev. Code § 4112.02(A)

### 1. Moore

With respect to plaintiff's allegation of race discrimination in violation of Ohio Rev. Code § 4112.02(A),[6] Moore argues on summary judgment that he is entitled to immunity under Ohio Rev. Code § 2744.03(A)(6). (Moore Mot. at 3327-29.).

That section provides in relevant part that:

(A) In a civil action brought against a political subdivision or an employee of a political subdivision to recover damages for injury, death, or loss to person or property allegedly caused by any act or omission in connection with a governmental or proprietary function, the following defenses or immunities may be asserted to establish nonliability:

* * * *

(6) . . . the employee is immune from liability unless one of the following applies:

(a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;

(b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;

(c) Civil liability is expressly imposed upon the employee by a section of the Revised Code. . . . .

---

[6] Plaintiff does not assert a claim of reverse race discrimination against Moore under Title VII.

Plaintiff concedes that, in light of the Ohio Supreme Court's decision in *Hauser v. City of Dayton Police Dep't*, 17 N.E.2d 554 (Ohio 2014), Moore is immune from liability with respect to Pingle's claim for race discrimination pursuant to Ohio Rev. Code. § 4112.02(A). (Opp'n Moore at 3698-99.) Accordingly, Moore's motion for summary judgment on Count 2 of plaintiff's is GRANTED.

### 2. Failure to promote

#### a. Applicable law

Plaintiff's claim for reverse race discrimination against the Board is asserted under both Title VII and Ohio Rev. Code. § 4112.02(A). Ohio courts apply federal case law interpreting Title VII to state employment discrimination claims. *Mitchell v. Toledo Hosp*., 964 F.2d 577, 582 (6th Cir. 1992) (applying the burden shifting framework from *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S. Ct. 1817, 3 L. Ed. 2d 668 (1973)); *Bucher v. Sibcy Cline, Inc*., 738 N.E.2d 435, 442 (Ohio App. 2000) (citing *Plumbers & Steamfitters Commt. v. Ohio Civ. Rights Comm*., 421 N.E.2d 128, 131 (Ohio 1981)). Because the standard is the same under Ohio and federal law, both claims are considered together.

Title VII prohibits discrimination in employment on the basis of race. Under *McDonnell Douglas*, a plaintiff carries the initial burden under the statute to establish that: (1) he is a member of a protected class; (2) he sought and was qualified for an open position; (3) despite his qualifications he was denied the position; and (4) an individual who is not a member of a protected class was given the position. *McDonnell Douglas,* 411 U.S. at 802.

In reverse discrimination cases, the Sixth Circuit has modified the *McDonnell Douglas* burden shifting framework, requiring a plaintiff to initially establish that: (1) defendant is the "unusual employer" who discriminates against the majority; (2) he was qualified for the

position in question; (3) he suffered an adverse employment action; and (4) he was treated differently than other similarly situated employees not members of the protected class. *Treadwell v. American Airlines, Inc*. 447 F. App'x 676, 678 (6th Cir. 2011) (applying Title VII precedent to claims under Tennessee law) (citing *Leadbetter v. Gilley*, 385 F.3d 683, 690 (6th Cir. 2004)).

At the outset, Pingle argues that he does not have to prove that the Board is the "unusual employer" that discriminates against the majority because the Sixth Circuit has called that standard into question.  (Opp'n Board at 3677.) The cases cited by plaintiff, however, do not alter the Sixth Circuit's modified *McDonnell Douglas* test for establishing a prima facie case of discrimination, but only caution against letting these modifications "impose a heightened pleading standard on majority victims of discrimination." *See e.g. Simpson v. Vanderbilt Univ.,* 359 F. App'x 562, 569 (6th Cir. 2009) (quoting *Zambetti v. Cuyahoga Cmty. Coll*. 314 F.3d 249, 255 (6th Cir. 2002)).

It is true that there is a "widespread circuit split" regarding application of the *McDonnell Douglas* prima facie test in reverse discrimination cases. *See McNaught v. Virginia Cmty. Coll. Sys*., 933 F. Supp. 2d 804, 818 (E.D. Va. 2013) (collecting cases and grouping the Sixth Circuit with the Seventh, Eighth, Tenth and D.C. circuits that require reverse discrimination plaintiffs to show "background circumstances that demonstrate that a particular employer has reason or inclination to discriminate invidiously against [majoring groups] . . . or evidence there is something 'fishy' about the facts at hand. *Gore v. Indiana Univ*., 416 F.3d 590, 592 (7th Cir. 2005)[.]" (alteration in original) (other citations omitted)).

Plaintiff has not advanced any case law to support a conclusion that the Sixth Circuit's modified prima facie test has been abandoned by the Sixth Circuit or abrogated by the Supreme Court. That said, there are a number of "background circumstances" by which a

plaintiff may meet this requirement, including "evidence of ongoing racial tension in the workplace." *Treadwell*, 447 F. App'x at 678 (citing *Boger v. Wayne Cnty.*, 950 F. 2d 316, 324-25 (6th Cir. 1991)).

If plaintiff establishes a prima facie case of reverse discrimination, the burden shifts back to the Board to offer a legitimate, nondiscriminatory reason for selecting Moore, rather than Pingle, as interim superintendent. If the employer carries this burden, plaintiff must then demonstrate the reasons offered by the employer is a pretext for discrimination. *Leadbetter*, 385 F.3d at 690 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S, Ct. 1089, 67 L. Ed. 2d 207 (1981) (citing *McDonnel Douglas*, 411 U.S. at 902)).

### b. Analysis

Plaintiff claims that he was not promoted to interim superintendent because he is Caucasian. It is undisputed that before Pingle arrived in the school district, racial tensions were high, at least as far back as February 2011 beginning with the racial incident involving Popp,[7] and that these tensions continued into the 2011-12 school year. (Ref. Rpt. at 3343.) The allegations against Popp in February 2011 precipitated the filing of a complaint with the OCR and a "lengthy and comprehensive investigation." (*Id*. at 3342.) "[W]hat is important and relevant is the fact that going into the 2011-12 school year, even if the coach Popp incident had been somewhat resolved, there was still the need for the Board to be sensitive to the issue of racial tension." (*Id*. at 3343.) In addition, Hardwick was relieved of her duties as superintendent in November 2011 for conduct which "may have led to or perpetuated some of the race issues that existed in the District" and she thereafter filed a civil rights complaint against the school district. (*Id*. at 3354.).

---

[7] Around January and February 2011, the boy's high school basketball coach, Jason Popp, was accused of directing derogatory comments and racial slurs toward his student athletes. (Hearing Tr. at 88-89.).

The undisputed racial tensions in the district that existed upon Pingle's arrival and continued into 2012 constitutes a background circumstance under which the Board may have had a reason or inclination to discriminate against a majority individual, and satisfies the first prong of the modified prima facie factors in a reverse discrimination case. *Treadwell*, 447 F. App'x at 678. There is no dispute that Pingle was considered for the position of interim superintendent by the Board and suffered an adverse employment action when he was not selected for the position, and defendant does not dispute that factors 2 and 3 of the prima facie test are met. (Board Mot. at 3525.) With respect to the final factor, the Board states that "[a]rguably Dr. Moore had better qualifications than Pingle regarding prong four, but for the purposes of this motion only, defendant will assume that prong four is also satisfied." (Board Mot. at 3525.) Accordingly, the Court finds that plaintiff has established a prima facie case for the purposes of summary judgment.

Having established a prima facie case, the burden shifts to the Board to demonstrate a legitimate, non-discriminatory reason for selecting Moore over Pingle for the position. According to the Board, Moore was selected because: (1) of his credentials; (2) he had been in the school district for a longer period of time than Pingle; (3) he was more familiar with the district and ongoing issues; and (4) he had acted as superintendent for a few weeks while Hardwick was on a medical leave and done a "wonderful job." (Hearing Tr. at 282-83 (604-06[8]).).

When the Board articulates a non-discriminatory reason for selecting Moore and not selecting Pingle, the burden shifts back to Pingle to demonstrate the Board's reason is simply a pretext for prohibited discrimination. Plaintiff can demonstrate pretext by showing that the

---

[8] The hearing transcript was filed on the record with four pages of transcript text on each filed page. Therefore, citation to the transcript, in addition to the page identification numbers, identifies the transcript page number in parenthesis.

Board's stated reason for selecting Moore as superintendent: (1) has no basis in fact; (2) did not actually motivate the Board to select Moore; or (3) was insufficient to warrant not selecting Pingle for the position. *Wheat v. Fifth Third Bank*, 785 F.3d 230, 240 (6th Cir.  2015) (quoting *Loyd v. St. Joseph Mercy Oakland,* 766 F.3d 580, 590 (6th Cir. 2014)). Pingle contends that the Board's stated reasons for selecting Moore are pretextual because racial tensions in the school district, not Moore's credentials, were the motivating reason for the Board's decision.

The record is replete with testimony from Pingle that Kaye—Board president at the time—repeatedly told him that Moore would be chosen for superintendent because of Moore's race in order for the board to avoid allegations of racism. According to the referee's report, evidence was elicited on this point, but the referee did not find it to be conclusive and found that Kaye's testimony not to be credible in several respects. (Ref. Rpt. at 3348-500.) Kaye denies that Pingle was not appointed because he is Caucasian. (Hearing Tr. at 283 (607).).

At the § 3319.16 hearing, Kaye testified that:

> The way that I had described it to [Pingle] is that we always had to be as a board cognizant of appearance. And the appearance is that [Pingle] had just testified against Linda Hardwick, who is a black woman, older black woman, who's also filed a civil rights complaint against the district. That, you know, he is a white male. And that we would be basically overturning potentially somebody [Moore] who had been in that position in a precedent standpoint.

> So we have Dr. Moore, who's done the position. He's done it well. He's got more tenure within the school district. . . .

> And given the fact that we had all the other civil rights complaints in the district, that it would just look really bad.

(Hearing Tr. at 283 (606).).

Another board member, Aaron Burko, testified that when discussing Moore's qualifications and experience to be superintendent, Kaye would "kind of throw in [a] statement at the very end, and it doesn't hurt that he's black as well." (Doc. No. 82-1 (Deposition of Aaron

Burko ["Burko Dep."] at 2017.). But board members deny that there was any discussion of race at the board meeting when Moore was selected. (*See* Doc. No. 92-1 at 3590 (Aff. of Bobby Jordan) ¶ 2 and at 3591 (Aff. of Linda Pliodzinskas) ¶ 2.).

Statements of the board president—Kaye—are insufficient to establish direct evidence of discrimination and there is no evidence in the record that Kaye exercised influence over the other board members. *See Kendall v. Urban League of Flint*, 612 F. Supp. 2d 871, 881 (E.D. Mich. 2009) (citing *Scarbrough v. Morgan Cnty Bd. of Educ.*, 470 F.3d 250, 262 (6th Cir. 2006)). But construing the facts in a light most favorable to the plaintiff as the Court must on summary judgment, there is sufficient circumstantial evidence from which a reasonable jury could conclude that the Board's stated reasons for selecting Moore are pretextual, and that the board actually selected Moore on account of his race because of the racial tensions and sensitivities in the school district at that time.

Whether plaintiff can persuade a jury he was not selected to be superintendent because he is Caucasian remains to be seen. But on summary judgment, plaintiff has sufficiently identified a genuine dispute of fact regarding the Board's true reasons and motivations in selecting Moore, and it will be for a jury to assess the credibility of witnesses and make those fact determinations.

### 3. Salary

Pingle claims that Board discriminated against him on the basis of his race in violation of Title VII because the the Board paid him less that they paid Moore, who was the elementary school principal before he was promoted to interim superintendent. Pingle's salary as high school principal was $78,500.00. Moore was hired as elementary school principal in 2010, and his salary was $90,000.00.

Early in August 2011, the high school was without a principal and Hardwick was tasked with hiring a principal by the Board. Hardwick told the Board that she could hire a high school principal for $75,000.00 (Hearing Tr. at 171 (367-68)), and was instructed not to exceed a salary of $80,000.00 (Hearing Tr. at 649 (1578)). The position was posted for a salary of $75,000.00, and each applicant interviewed by Moore was told the salary for the position was $75,000.00. (Hearing Tr. at 390 (827-28).).

After interviewing Pingle, Moore told Hardwick that a salary of $75,000.00 was too low for a high school principal, and Moore and Hardwick went to the treasurer, Brenda Brcak, to see if it was possible to increase the offer. (Hearing Tr. at 390 (828).) Brcak authorized an increase to $78,500.00. (Hearing Tr. at 171 (367-68); at 390 (828-29).) Pingle was satisfied with this salary, as it was an increase over his prior salary. (Doc. No. 90-1 (Deposition of Timothy Pingle ["Pingle Dep."] at 3025).) The Board understood that the new high school principal was being paid less than the former high school principal, but the Board's discussion "was around the District's current financial situation, and if we could get somebody for less, then why shouldn't we?" (Burko Dep. at 2011.).

Pingle claims that the treasurer, Brenda Brcak, told him that Hardwick was racist and Hardwick wanted to help black people and not white people and that it was unfair because high school principals should make more than elementary school principals. (Pingle Dep. at 3052-53.) But Pingle acknowledges that while Brcak indicated it might be unfair that he was paid a lower salary than Moore, Brcak never said that Pingle was paid less because he was Caucasian, and Pingle never heard a member of the school board state that the board wanted to pay Pingle less because he was Caucasian. (Pingle Dep at 3054 and 3056.) Somewhat inconsistently, Pingle also claims that Kaye told plaintiff his salary was set lower than Moore's

for "racial reasons" and that Hardwick had recommended a lower salary because she is "antiwhite." (Pingle Dep. at 3057-58.).

Kaye testified that he told Pingle that the school district was in a financially distressed situation, and Pingle could address any salary concerns with the Board at the end of the year for consideration of a higher salary. (Hearing Tr. at 287 (623).) When Moore became interim superintendent, he told his staff that no one—including Mr. Booker, an African American who was assistant principal at the high school and promoted to interim elementary school principal—was going to get a pay raise because the school district was on "life support." (Hearing Tr. 781 (1832-33).) Pingle himself knew that the school district "was in financial trouble." (*Id*.).

### a. Applicable law

Unequal pay claims based on race are brought pursuant to Title VII, rather than the Equal Pay Act, which only addresses gender based pay differences. But the analysis is "essentially the same under both the Equal Pay Act and Title VII." *Odomes v. Nucare, Inc.* 653 F.2d 246, 250 (6th Cir. 1981) (citations omitted); *Kline v. Portage Cnty. Bd. of Com'rs*, 5 F. Supp. 3d 902, 920 (N.D. Ohio 2014) (citations omitted).

To establish a prima facie case of unequal pay, plaintiff must show that the defendant pays different wages to employees of different races "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Kline,* F. Supp. 3d at 920 (quoting *E.E.O.C. v. Romeo Cmty. Sch.,* 976 F.2d 985, 987 (6th Cir. 1992)) (internal quotation marks and further citations omitted). In this case, there is no dispute that plaintiff—a Caucasian—was paid less as high school principal than Moore—an African American—was paid as elementary school principal. Plaintiff

contends that the responsibilities of a high school principal actually requires greater effort and responsibility than an elementary school principal, but for the purpose of this analysis, plaintiff has established that the work of the two principals requires "substantial equality of skill, effort, responsibility and working conditions," a prima facie case of reverse discrimination with respect to his salary. *Odomes*, 653 F.2d at 250.

If plaintiff establishes a prima facie case, the burden shifts to defendant to show that the difference in pay is due to one or more of four affirmative defenses: "(1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any other factor other than [race]." *Kline*, 5 F. Supp. 3d at 922 ("The Supreme Court has determined that Title VII incorporates the four affirmative defenses of the Equal Pay Act.") (citing *Cnty. of Washington v. Gunther,* 452 U.S. 161, 192, 101 S. Ct. 2242, 68 L. Ed. 2d 751 (1981)); *Cole v. N. Am. Breweries*, No. 1:13-CV-236, 2015 WL 248026, at *8 (S.D. Ohio Jan. 20, 2015) (quoting *Foco v. Fruedenberg-NOK Gen. P'tship,* 549 F. App'x 340, 344 (6th Cir. 2013) (further quotations omitted). The fourth factor is a catchall provision which permits consideration of factors that were adopted for a "legitimate business reason." *E.E.O.C. v. J.C. Penney, Inc.* 843 F.2d 249, 253 (6th Cir. 1988) ("We now hold that the legitimate business reason standard is the appropriate benchmark against which to measure the 'factor other than sex defense.'"). Legitimate business reasons can include budget constraints. *See e.g. Fagen v. Iowa*, 324 F. Supp. 2d 1020, 1026 (S.D. Iowa 2004).

The defendant bears the burden of proof of establishing one of the four affirmative defenses. *Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97, 84 S. Ct. 2223, 41 L. Ed. 2d 1 (1974); *Beck-Wilson v. Principi,* 441 F.3d 353, 360 (6th Cir. 2006) (citing *Corning Glass Works*, 417 U.S. at 196). An employer is entitled to summary judgment on the basis of one

of the affirmative defenses if the defendant establishes that race played no part in the wage differential such that no rational jury could find to the contrary. *Cole*, 2015 WL 248026, at *9 (citations omitted).

Plaintiff does not dispute that the school district was in financial distress at the time he was hired to be high school principal, which was at least one year before Moore was hired as elementary school principal. It is also undisputed that the salary for the position was identified as $75,000, with an upper limit of $80,000.00, at the time Hardwick was tasked by the Board to find a high school principal. These salary parameters were determined before anyone had applied for the position, and could not have been established on the basis of race because the race of the candidate that would be selected was unknown. It is also undisputed that, after Pingle was identified as the candidate, Moore and Hardwick—both African American—sought to increase the offer of $75,000 to a higher number within the upper limit established by the Board, and succeeded in obtaining such authorization from the treasurer to increase the offer to $78,500.00.

Based on these undisputed facts, the Court finds that no rational jury could find that race played any part in the reason that Pingle was paid less than Moore, or that the Board discriminated against Pingle with respect to his salary on the basis of race. Accordingly, the Board is entitled to summary judgment on this claim.

## D. Count 3 and 4—Retaliation in Violation of Title VII and Ohio Rev. Code § 4112.02(I)

### 1. Applicable law

Title VII prohibits an employer from retaliating against an employee who has either: (1) opposed any practice made an unlawful employment practice by this subchapter, or (2) made a charge, testified, assisted, or participated in any manner in an investigation,

proceeding, or hearing under this subchapter. 42 U.S.C. § 2000e–3(a). These two provisions, respectively, constitute the 'opposition' and the 'participation' clauses." *E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1066 (6th Cir. 2015). "[A] violation of Title VII's retaliation provision can be found whether or not the challenged practice ultimately is found to be unlawful." *Johnson v. Univ. of Cincinnati,* 215 F.3d 561, 579 (6th Cir. 2000) (citing *EEOC Compliance Manual*, (CCH) ¶ 8006).

The standard for proving a retaliation claim in the employment context is the same under Ohio law[9] as it is under Title VII. *See Miami Valley Fair Housing Ctr., Inc. v. Connor Grp.*, 725 F.3d 571, 578-79 (6th Cir. 2013) (citing *Hughes v. Miller*, 909 N.E.2d 642, 647 (Ohio App. 2009) ("Ohio's anti-retaliation law[, Ohio Rev. Code § 4112.02(I),] has a broader scope than Title VII because it does not limit its coverage to people in an employer-employee situation . . . but the standard for proving retaliatory discrimination in the employment context is the same under Ohio law as it is under Title VII.")). Because the law governing plaintiff's retaliation claims under Title VII and Ohio Rev. Code § 4112.01(I) is the same, the Court will consider both together, although the Title VII claim is asserted against only the Board, and the state claim is asserted against both the Board and Moore.

To establish a prima facie case of retaliation under Title VII and Ohio law, plaintiff must demonstrate:

> (1) [plaintiff] engaged in activity protected by Title VII; (2) the defendant[s] knew of [plaintiff's] protected activity; (3) thereafter, the defendant[s] took adverse action against the [plaintiff]; and (4) a causal connection existed between the protected activity and the materially adverse action.

---

[9] Under Ohio law, it is unlawful "[f]or any person to discriminate in any manner against any other person because that person has opposed an unlawful discriminatory practice defined in this section[,]" including discrimination on the basis of race. Ohio Rev. Code § 4112.02(I).

*New Breed Logistics*, 783 F.3d at 1066 (6th Cir. 2015) (citing *Taylor v. Geithner,* 703 F.3d 328, 336 (6th Cir. 2013)).

        With respect to the fourth factor, plaintiff must establish that the unlawful retaliation would not have occurred but-for the alleged wrongful action of the employer. *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 770 (6th Cir. 2015) ("[B]ack to the EEOC's prima facie case, for it provides an alternate ground on which to grant summary judgment: The EEOC cannot establish but-for causation. To prevail on a retaliation claim, a plaintiff must 'establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer.'") (quoting *Univ. of Texas Sw. Med. Ctr. v. Nassar,* —U.S. —, 133 S. Ct. 2517, 2534, 186 L. Ed. 2d 503 (2013)), and *Ford Motor Co*., 782 F.3d at 782 (K. Moore, J., dissenting) ("[T]he EEOC met its burden to establish a prima facie case of retaliation—that the retaliation was the but-for cause of [employee's] termination[.]"); *Laughlin v. City of Cleveland*, —F. Supp. 3d—, 2015 WL 1538892, at *5 (N.D. Ohio Apr. 7, 2015) ("To make out a prima facie case of retaliation, the plaintiff must prove 'that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'") (quoting *Nassar*, 133 S. Ct. at 2533).

        In order to establish a prima facie case of retaliation, Pingle must present evidence from which a reasonable jury could find that the Board would not have terminated his contract but-for his alleged protected activity. If plaintiff establishes a prima facie case, then the burden of production shifts to defendants to proffer legitimate, non-retaliatory reasons for terminating plaintiff. *New Breed Logistics,* 783 F.3d at 1066 (citing *Canitia v. Yellow Freight Sys., Inc*., 903 F.2d 1064, 1066 (6th Cir.1990) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973))). If the defendants proffer legitimate, non-retaliatory

reasons for terminating plaintiff, the burden shifts back to the plaintiff to show that the proffered

reason are not the true reasons, but merely a pretext for retaliation. *Id.* (citing *St. Mary's Honor*

*Ctr. v. Hicks,* 509 U.S. 502, 515–16, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993) and *Texas Dep't*

*of Comm. Affairs v. Burdine,* 450 U.S. 248, 256, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)).

### 2. Events surrounding Pingle's allegations of retaliation

Plaintiff's claims of retaliation against Moore and the Board are woven together

as the events at issue in this case unfolded and in the parties' briefs.[10] Accordingly, the Court

will address both together. Since timing of the alleged protected activities and alleged retaliatory

conduct are relevant in retaliation actions, the Court will first summarize the sequence of

undisputed events that plaintiff claims supports his allegations of retaliation.

As noted in the Court's initial summary, shortly after Pingle was hired as the high

school principal in August 2011, then superintendent Hardwick was suspended on November 3,

2011, and the Board was required to appoint an interim superintendent. Hardwick was suspended

for allegedly disclosing confidential and privileged documents to outside parties in connection

with an ongoing civil rights investigation, and after she was suspended, Hardwick herself filed a

complaint with the U.S. Department of Education's Office of Civil Rights and with the Ohio

Civil Rights Commission alleging race discrimination, retaliation, and racial animus by Board

president Joshua Kay and Board member Bob Fox.

---

[10] Plaintiff requested leave to file a consolidated opposition to defendants' motions for summary judgment, which the Court denied in the interest of clarity and required plaintiff to file separate responses to the defendants' summary judgment motions. (*See* non-document order dated July 21, 2015.) Contrary to the Court's order, plaintiff incorporated the facts alleged in his Brief in Opposition to the Board's summary judgment motion into his Brief in Opposition to Moore's summary judgment motion. (Opp'n Moore at 3696.) As a consequence of plaintiff's disregard for the Court's order, defendant Moore incorporated aspects of the Board's reply brief into Moore's reply brief. (Moore Reply at 3765-66 at n. 1.) Plaintiff's briefing tactics, which led Moore to react in kind, undermined the Court's efforts to achieve clarity in the briefing with respect to the complex circumstances of this case.

Pingle believed he was qualified for the position of interim superintendent. Pingle and Kaye began speaking by cell phone somewhat regularly after hours. According to plaintiff, Kaye complained to him about Hardwick's accusations of racism and that Hardwick had played "the race card." Plaintiff claims that on November 4, 2011, Kay called Pingle and told Pingle that he would recommend Moore for interim superintendent because the Board needed to replace Hardwick with an African American because of the pending civil rights claims and to avoid accusations of racism against the school district. (Hearing Transcript at 746-47 (1693-94).).

On November 6, 2011, Pingle sent Kaye and Fox an email regarding a CNN article about then presidential candidate Herman Cain's playing the race card in response to allegations of misconduct. The November 6 email reads as follows:

Subject: Always will be about race

When I read this article, I just could not help but think about what we are going through. If it is a person of color, it appears they will use that as a reason to get out of every trouble they are in. They will make race an issue and try to divert the real problem or use it to cover up their wrongdoing. I read this article and even though there is evidence to the contrary, Herman Cain who is running for President and a millionaire now has decided to blame his sexual harassment claim on the fact that he is black. It will only stop when we decide to focus on the wrong doing of someone and let them not divert it to something else.

It is at this website address: [website address omitted]

I am only trying to help you, because I know you are not a racist and a certain individual is trying to cover up her wrong doing by calling you a racist and making this out to be a race issue.

Respectfully,

Tim Pingle, Ph.D.

(Doc. No. 92-1 at 3550.).

When Pingle arrived at school on November 7, he heard that Moore would become interim superintendent, and sent another email to Kaye and Fox.

The November 7 email reads as follows:

Subject: Tim Pingle – Concerns

Joshua,

I am writing out of concern regarding the following:

1.) It is common knowledge among faculty and staff that Dr. Moore is going to be the Interim superintendent. I realize he has been here longer than me and you and the board are comfortable with him. That being said, I just hope the board is not going to make the same mistake they made when they hired Dr. Hardwick. I want you to remember that Dr. Hardwick brought Dr. Moore here from Cleveland City Schools. Why would she have brought him here unless he shared her same philosophy of doing things? Also, Cleveland City Schools does not have the best reputation in terms of how they treat their personnel and academic achievement.

I also want you to know that Dr. Moore has not always been honest in his dealing with me and not been supportive. I want you to know about an incident that happened when I first got hired. I told Mr. Bob Fox that Dr. Hardwick told me to hire a black female for my assistant principal or at least a black person (this is true). Bob told Dr. Moore because he thought he could trust him. Later that morning, I am in a meeting with Dr. Moore and Dr. Hardwick. What took place next made me re-think the character of Dr. Moore. He told Dr. Hardwick (with me present) that I just told Bob Fox that Dr. Hardwick told me to hire a black female for my assistant principal. He also went on to say that I broke regulations regarding hiring procedures for my assistant principal. I want you to know that Dr. Moore was of no assistance or help hiring the assistant principal. I was new and did not know everything. I went to his office for help and he gave me all the applications and stated he was out of it. THIS IS THE TRUTH. Dr. Moore denies this and makes me wonder about his character and if he will be truthful when I have to work with him. I AM REALLY CONCERNED ABOUT THIS.

Another thing that concerns me is that Dr. Moore tried to play the race card. Again, he was hired by Dr. Hardwick and comes from Cleveland City Schools. Again, you just went through a race allegation problem. I would not want you to get yourself in the same situation. Dr. Moore tried to insinuate that I did not want to hire any of the assistant principals because they were black. THIS IS THE TRUTH. I also want you to know he acted just like Dr. Hardwick. You cannot try to talk to him. When I tried to talk to him about this, he got really loud, was dishonest and arguementative [sic].

I just think you need to be very careful, because when you hire someone of color for a position, there is always a chance that they will play the race card. I am not suggesting that you cannot hire someone of color, I am just saying that you have to be careful.

I am telling you the truth. I have tried to talk with Dr. Moore recently and his character bothers me. He says he is going to call me back and does not. I have sent him a text message recently and he did not return it. I just want to work for someone that is honest and trustworthy.

2.) Dr. Moore has no high school experience and is in charge of a school that is in continuous improvement. I am not necessarily blaming him entirely for the report card of his school, but he does have some responsibility for it. As far as making him superintendent and being over the high school, it is difficult because has no high school experience. It can be done if he is willing to acknowledge some things and be able to work with people.

3.) My salary- It is common knowledge that high school principals are paid more than elementary principals. When I took this job, Dr. Hardwick told me there was no money and she could not pay me more. That is why I accepted my salary. I assumed the elementary principal also did not make much because of a lack of money, and was greatly surprise that Dr. Moore was making $90,000.00. I am respectfully asking that the board revisit my salary and pay me according to what a high school principal should make. I have night activities (sports and other things) that I am here for. An elementary principal does not have this. There are just more demands of a high school principal and that is why they are paid more. High school principal and middle school principals make more than elementary principals. Presently, I am in charge of accreditation, OGT and OOA testing as well as running my school. Dr. Moore has none of this and I am making far less. I am not getting any extra money for these duties and would like an increase in my salary that is comparable for what I do and what is expected.

4.) My experiences are greater than Dr. Moore. I have been a superintendent, high school principal, middle school principal and elementary principal. I have worked for the state department as a curriculum specialist. I bring a lot of experiences and I don't believe those can be discounted. Dr. Moore has some experiences, but they have all been at the elementary level. A superientendent [sic] is in charge of grades K-12. My doctorate is in Educational Administration. I am not sure what Dr. Moore's doctorate is in. I feel very qualified for the position.

I would like to discuss these concerns with you more, if you have time to give me the opportunity. Also, I would like to say that Dr. Hardwick always blamed my low salary on the board. She said the board would not pay me more. She also told me that when the Board turned over she was going to make my salary $90,000.00. Of course, with Dr. Hardwick I never knew what to believe.

I hope you consider my concerns. If you would like to discuss these with me, I would be more than willing to discuss them with you. I always have and always will be honest with you.

Respectfully,

Timothy Pingle, Ph.D.

(Doc. No. 6-13 at 1220-22 (emphasis in original).).

After Pingle sent the November 7 email to Kaye and Fox, Kaye called Pingle. According to Pingle, Kaye told Pingle that Kaye had to appoint Moore to protect himself against accusations of racism, and that Kaye would try to get a raise for Pingle. (Hearing Tr. Doc. No. 6-5 at 748-49 (1701-02).) Fox emailed Kaye that he was "stunned" by Pingle's timing in requesting a raise (Doc. No. 6-6 at 912), and Fox told Kaye in a telephone call that Fox was concerned about Pingle's mental stability and ability to be an effective administrator, and that Fox had forwarded Pingle's email to Charles Tyler, an attorney who was handling the investigation related to Hardwick. (Hearing Tr. at 287-88 (625-26).).

The evening of November 7, the Board unanimously selected Moore to be interim superintendent.

Early in December 2011, either Charles Tyler or Kaye provided Moore with Pingle's November 6 and 7 emails. (Hearing Tr. at 398-99 (860-63).) Moore testified that he was disturbed by the racial content of the emails, and as interim superintendent and the school district's civil rights compliance officer, was responsible for investigating incidents of this nature. (Hearing Tr. at 399 (864-66).) On December 12, 2011, Moore issued a letter to Pingle indicating that he was concerned about the racial nature of Pingle's emails and whether they violated the Board's policy prohibiting discrimination, and about Pingle's ability to objectively evaluate and interact with teachers and students of color. Moore advised Pingle that he would

bring Pingle's emails to the attention of the Board and the Board's attorney. (Doc. No. 92-1 at 3553-54.) That same day, Moore transmitted this information to the Board, indicating that the matter should be addressed by the Board in executive session. (Doc. No. 92-1 at 3605.).

Upon receiving Moore's letter, and before the Board meeting that evening, Pingle sent an email to the entire Board entitled "My Side of the Story." According to plaintiff, another board member, Linda  Pliodzinskas, urged him to write the board immediately to respond to Moore's accusations. (Hearing Tr. at 749 (1704-05).) This email is not reproduced herein because it is four (4) pages long, but is contained in the record at Doc. No. 92-1 at 3559-62.) Early in the email, Pingle advises the Board that he has "consulted with an attorney and this is documentation for my attorney and any future law suit that may arise from any action taken against me.  Everything in this e-mail is the truth." (Doc. No. 92-1 at 3559.) In "My Side of the Story," among other things, Pingle states that Kaye told him that Moore would be named interim superintendent to avoid accusations of racism, criticizes Moore's performance as interim superintendent, questions the "ulterior motives" of Moore and Kaye, and asserts that Pingle's prior emails were sent to Kaye and Fox because Pingle believed that the interim superintendent should be selected based on qualifications, not race. (Doc. No. 92-1 at 3559-62.)

The Board shared Pingle's "My Side of the Story" with Moore, although it is unclear when that took place. (Hearing Tr. at 403-04 (882-83).) One of the Board's lawyers, "former Board member Charles Tyler (African-American), was engaged to 'investigate' whether Pingle's November e-mails were 'racist' or violated Board  policy." (Opp'n Board at 3670 (parenthetical in original) (citations to Moore deposition and Tyler's investigative report omitted)).

On December 13, 2011, Moore advised Pingle by letter that he had recommended to the Board that Pingle be suspended with pay pending an investigation and hearing. (Doc. No. 92-1 at 3603-04.) Moore's recommendation was adopted by the Board at its meeting on December 12, 2011. (Doc. No. 86-1 at 2622.) On December 15, 2011, Moore notified Pingle that he would present to the Board the question of whether termination proceedings should be initiated, and later, that he would recommend suspension without pay. (Doc. No. 6-7 at 1052; Doc. No. 6-6 at 958-59.).

In addition, on January 6, 2012, Moore completed a form lodging a complaint against Pingle with the Ohio Department of Education ("ODE"). (Doc. No. 2866-71.) According to the first paragraph of the form, "Ohio Revised Code 3319.13 and 5126/253 requires public and nonpublic schools . . . to report . . . the name and factual statement of any license holder who engages in professional misconduct." (Doc. No. 88-1 at 2267.) The form filed by Moore indicates that Pingle engaged in conduct unbecoming to the teaching profession by making racial and derogatory comments about African Americans, and by encouraging the board to use race as a factor in selecting the interim superintendent, and cites Pingle's emails of November 6 and 7, 2011. (*See* Doc. No. 88-1 at 2866-69.) By letter dated March 20, 2012, Pingle was informed by the ODE that "[a]s a result of their investigation [into Moore's allegations], we have determined that no disciplinary action will be pursued and the investigation is closed." (Doc. No. 88-1 at 2871.).

On February 27, 2013, the Board voted unanimously to institute termination proceedings against Pingle for five (5) reasons, and to suspend him without pay. (Doc. No. 92-1 3614-15.) Pingle filed an EEOC charge on March 9, 2012, alleging that he was paid less than Moore, and not selected as superintendent, because he is Caucasian. (Doc. No. 92-1 at 3623.)

As previously discussed, a § 3319.16 hearing was held and the referee recommended termination for just cause on two (2) of the five (5) reasons. The Board unanimously adopted the referee's recommendation and terminated Pingle on September 10, 2012. (Doc. No. 92-1 at 3617-3619.).

### 3. Analysis

Plaintiff alleges that he was suspended and terminated by the Board in retaliation for engaging in the protected activities of opposing the selection of an interim superintendent on the basis of race, complaining that he was not considered for interim superintendent because he was Caucasian, complaining that he was paid less than Moore because of race, and for filing an EEOC charge on March 9, 2012. With respect to Moore, plaintiff contends that Moore's recommendations to the Board regarding plaintiff's suspension and termination, and charges to the ODE, were in retaliation for plaintiff's protected activities. (*See* Am. Compl. ¶¶ 66-75.).

#### a. Prima facie case of retaliation

In order to establish a prima facie case of retaliation, plaintiff must demonstrate that: (1) plaintiff engaged in activity protected by Title VII; (2) the Board and Moore knew of the protected activity; (3) Moore and the Board took materially adverse action against plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action. *New Breed Logistics*, 783 F.3d at 1066 (citation omitted). Moore and the Board contend that plaintiff cannot establish a prima facie case of retaliation because plaintiff did not engage in protected activity, and even if he did, plaintiff cannot establish that the protected activity was the but-for cause of his termination.

Plaintiff contends that his emails of November 6 and 7, 2011, and the December 12 "My Side of the Story" email,[11] constitute protected activity because in those emails, plaintiff opposes the Board's selection of Moore as interim superintendent based on race, and objects to plaintiff's compensation being lower than Moore, who was the elementary school principal before being selected as interim superintendent. Defendants contend that Pingle's emails do not oppose race discrimination in the selection of the interim superintendent, but rather constitute racial stereotyping by Pingle at its worst (Board Mot. at 3533), and a plain reading of the emails reveal racial disparagement and an invitation to the Board to engage in discrimination against people of color. (Moore Mot. at 3334.).

Defendants further contend that the November 6 and 7 emails are not oppositional because they do not clearly put the defendants on notice that plaintiff is opposing discriminatory conduct, and that plaintiff's "My Side of the Story" email is just a "cover-up" for the November 6 and 7 emails, which the referee describes as racist at worst or poor judgment at best.[12] It is true that oppositional activity must be sufficient to place the employer on notice that the employee is complaining about statutory rights, and vague charges are insufficient. *Brown v. VHS* 545 F. App'x 368, 373-74 (6th Cir. 2013) (citations omitted). That said, the December 12 email purports to establish a context for the November 6 and 7 emails, and squarely calls out as illegal the Board's selection of a superintendent based on race, as well as other discriminatory conduct.

---

[11] Defendant argues that plaintiff should not be permitted to assert that his "My Side of the Story" email is an oppositional statement that constitutes protected activity because plaintiff only pled the emails of November 6 and 7 are oppositional materials. With respect to that December 12, 2011 email, plaintiff's amended complaint alleges that he emailed the board "explaining the private emails [of November 6 and 7] and explaining that these communications were taken out of context [by Moore]." (Am. Compl. ¶ 33.) To the extent that plaintiff has alleged that the November 6 and 7 emails constitute oppositional activity, and his December 12, 2011 email purports to explain the same, plaintiff has also arguably alleged that the explanatory email constitutes oppositional activity. It will be for a jury to decide whether Pingle's December 12, 2011 email is truly an attempt to put his November 6 and 7 emails in context, or, in actuality, an attempt to recast, after-the-fact, what appears to be emails containing racist stereotypes.

[12] Ref. Rpt. at 3355.

An employee engages in protected activity when he complains in good faith to a superior about perceived unlawful employment practices, and "discrimination complainants have fairly wide latitude in the manner in which they express their complaints."  *Finch v. Xavier Univ.*, 689 F. Supp. 2d 955, 966 (S. D. Ohio 2010) (citing *Booker v. Brown & Williamson Tobacco Co., Inc.,* 879 F.2d 1304 (6th Cir.1989)). Whether plaintiff's complaints about alleged discriminatory conduct were made in good faith is a credibility question for a jury to decide considering all of the evidence, including the degree to which there was a basis for the complaint. *Id*.

On summary judgment, the Court must construe the facts in a light most favorable to the plaintiff. While it is a close call, the Court concludes that plaintiff has come forward with sufficient evidence to establish a genuine issue of fact as to whether he engaged in protected activity.

The next step in the prima facie case analysis is that the defendants were aware of the protected activity. It is undisputed that Moore and all of the Board members received copies of Pingle's November 6 and 7 emails early in December, and on December 12, 2011, all of the board members received plaintiff's "My Side of the Story," which the Board shared with Moore. (Hearing Tr. at 403-04 (882-83).).

The third step in establishing a prima facie case of retaliation is that a materially adverse action was taken against plaintiff. In this case, plaintiff was first suspended with pay,[13] and then suspended without pay, and then terminated. Defendants apparently concede that plaintiff's suspension and termination constitutes an adverse action for purposes of establishing a

---

[13] The Board cites *Peltier v. United States*, 388 F.3d 984, 988 (6th Cir. 2004) for the proposition that suspension with pay does not constitute an adverse employment action. (Board Reply at 3757.). *Peltier* was decided before *Burlington Northern & Santa Fe Ry v. White*, 548 U.S. 53, 67-68, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006), which reduced plaintiff's burden of establishing an adverse action in the retaliation context.

prima facie case of retaliation.

The final step in establishing a prima facie case of retaliation is that plaintiff must demonstrate a causal connection between the protected activity and adverse action. Under *Nassar*, plaintiff must demonstrate "but-for" causation to establish his retaliation claim.

Temporal proximity of an adverse action to the protected activity alone is insufficient to establish the requisite causal connection between the two. *Randolph v. Ohio Dept. of Youth Servs.*, 453 F. 3d 724, 737 (6th Cir. 2006). That said, the temporal proximity is a factor to consider in determining causation, but is dependent on the individual factual circumstances of a case. For the purpose of this analysis, the alleged protected activity and the defendants' adverse action against Pingle took place within a few months and is sufficient to avoid dismissal on the grounds that the time between the protected activity and adverse action was so lengthy as to sever the causal connection between the two. *Id.* (six months sufficient to support causal connection).

In typical retaliation cases, the protected activity and the employer's reason for termination are not the same. For example, a plaintiff complains about discriminatory conduct, but the employer claims that the employee was terminated for poor performance. In such cases, plaintiff must demonstrate that he would not have been terminated but for his protected activity, notwithstanding any performance issues.

This case is not typical in that defendants do not dispute that plaintiff was terminated because of his emails, and the causation issue revolves around the parties' differences in view as to their content. Defendants say the emails demonstrate racism and racial insensitivity that made plaintiff unsuitable as a high school principal. Plaintiff says that the emails constitute oppositional activity to defendants' discriminatory conduct. For purposes of summary judgment,

the Court has concluded that the issue of whether Pingle's mails constitute protected activity survives summary judgment, and it is for a jury to decide whether one or more of the emails at issue constitute protected activity. Since defendants admit that Pingle was terminated because of his November 6 and 7 emails, summary judgment is not appropriate on the causation prong of plaintiff's prima facie case.

### b. Legitimate non-retaliatory reason for discharge

Once a prima facie case is established, the burden of production shifts to defendants to proffer legitimate, non-retaliatory reasons for terminating plaintiff. Defendants meet this burden of production based on the Board's adoption of the referee's recommendation that there was good and just cause to terminate plaintiff.

### c. Pretext

If the defendants proffer legitimate, non-retaliatory reasons for terminating plaintiff, the burden of persuasion shifts back to the plaintiff to show that the proffered reason is not the true reason, but merely a pretext for retaliation. To meet this burden, plaintiff must produce evidence that provides a sufficient basis upon which a fact finder could reject the defendants' proffered reason. *McBroom v. Barnes & Noble Booksellers, Inc*., 747 F. Supp. 2d 906, 922 (N.D. Ohio 2010) (quoting *Haughton v. Orchid Automation*, 206 F. App'x 524, 531 (6th Cir. 2006)).  An employee may establish pretext for retaliation by showing that the proffered reason: (1) has no basis in fact; (2) did not actually motivate the adverse action; or (3) was insufficient to warrant the adverse action. *Id*. (quoting *Hopson v. Daimler Chrysler Corp*. 306 F.3d 427, 434 (6th Cir. 2002)). This issue goes to the question of defendants' motivations.

Based on the record before it, the Court finds that there is a genuine issue of fact regarding the basis for and defendants' motivations with respect to the adverse employment

actions taken as to plaintiff, and that a reasonable jury could find defendants' proffered reasons for the actions taken against Pingle are pretextual.

Accordingly, the Court concludes that summary judgment is not appropriate on plaintiff's retaliation claims against Moore and the Board.

## E. Count 5—Aiding and Abetting Discrimination in Violation of Ohio Rev. Code § 4112.02(J)

In count 5, plaintiff claims that Moore violated Ohio Rev. Code § 4112.02(J) by setting into motion a "campaign" that resulted in Pingle's retaliatory suspension and termination by the Board. Ohio Rev. Code § 4112.02(J) makes it unlawful

> For any person to aid, abet, incite, compel, or coerce the doing of any act declared by this section to be an unlawful discriminatory practice, to obstruct or prevent any person from complying with this chapter or any order issued under it, or to attempt directly or indirectly to commit any act declared by this section to be an unlawful discriminatory practice.

Moore argues that in order to establish a violation under § 4112.02(J), plaintiff must show that Moore engaged in an intentional wrongful act which assisted the Board in engaging in retaliatory conduct. Moore contends that plaintiff cannot do so because the referee concluded that the Moore and the Board had good cause to terminate plaintiff because of racially disparaging emails.

But the Court has found that the referee's conclusions in the § 3319.16 hearing did not decide nor preclude plaintiff's retaliation claim, and has denied the defendants' motion for summary judgment on plaintiff's retaliation claim. As a consequence, Moore's motion for summary judgment on his aiding and abetting claim must also be denied.

# III. CONCLUSION

For the all of the foregoing reasons, the defendants' motions for summary judgment are granted in part and denied in part as follows:

> Count 1 (Title VII discrimination against the Board): DENIED as to plaintiff's Title VII discrimination claim with respect to the Board's selection of Moore over Pingle as the interim superintendent; and GRANTED as to plaintiff's Title VII discrimination claim with respect to plaintiff's salary as high school principal.

> Count 2 (Ohio Rev. Code §§ 4112.02(A) discrimination against the Board and Moore): GRANTED as to plaintiff's Ohio Rev. Code §§ 4112.02(A) discrimination claims against MOORE; and GRANTED as to plaintiff's Ohio Rev. Code §§ 4112.02(A) discrimination claim against the Board with respect to plaintiff's salary as high school principal; and DENIED as to plaintiff's Ohio Rev. Code §§ 4112.02(A) discrimination claim with respect to the Board's selection of Moore over Pingle as the interim superintendent.

> Counts 3 and 4 (Title VII retaliation against the Board, and Ohio Rev. Code §§ 4112.02(I) retaliation against the Board and Moore): The Board's and Moore's motions are DENIED.

> Count 5 (Ohio Rev. Code §§ 4112.02(J) aiding and abetting against Moore): Moore's motion is DENIED.

Also pending before the Court is the Board's motion to exclude certain evidence pursuant to Fed. R. Civ. P. 37(c) and 30(e) with respect to an email that Pingle argues as evidence in support of his opposition to the Board's motion for summary judgment because it was not previously produced, and entries in the errata sheet to Pingle's deposition which the Board contends should be excluded because those material changes contradict answers given by Pingle in his deposition. (Doc. No. 102.) Plaintiff opposed the Board's motion (Doc. No. 107), to which the Board replies (Doc. No. 109). In ruling on the summary judgment motions, it was not necessary for the Court to consider the evidence which the Board seeks to exclude. Therefore,

the Board's motion is denied as moot without prejudice with leave to reassert those arguments as

may be appropriate to do so in the context of the trial or pretrial motions.

**IT IS SO ORDERED**.

Dated: October 27, 2015

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**